May please the court, Shereen Bokshay for Appellant Ricardo Marquez Machuca. I'd like to reserve three minutes for my reading. The State Court's determination that Mr. Machuca did not unambiguously invoke his right to silence when he told Police Investigator Casey that he did not want to talk about, quote, anything, was an objectively unreasonable application of clearly established Fifth Amendment jurisprudence. That was the conclusion of the District Court, and this Court should reach the same conclusion. Since the seminal case of Miranda v. Arizona was decided in 1966, the law has been clear that if a suspect unambiguously invokes his right to silence, his interrogation must immediately cease. Here Mr. Machuca did just that. Twenty minutes into his police interrogation, he told police investigators, quote, I don't want to talk about anything. Mr. Machuca's statement was a crystal clear indication that he did not want to talk any more about anything. That is the only reasonable interpretation of this statement. Counsel, if we assume that it was wrong to admit statements thereafter because, in fact, he had made an unambiguous request not to say anything anymore, I think you have an uphill battle on the prejudice prong, and I think probably you should concentrate on that. That's a very fair point. I think about habeas these days is almost impossible to overcome. Sure. I'll turn to prejudice. I'd just like to point out that because the court of appeal only addressed the threshold issue of whether there was a Fifth Amendment violation, the Court's review of the prejudice prong in Strickland is de novo. Why is it de novo after Harrington v. Richter? The California Supreme Court denied review here, and it's denied it on the merits, according to Harrington. That's correct. But there is a reasoned State – there is a reasoned opinion, the State appellate court decision. And the reason there, the issue that they addressed is the Fifth Amendment. I believe that was also the case in Harrington. I'm not sure on that point, but there are two Supreme Court cases that specifically state that on an ineffective assistance of counsel claim, if the court decides on, you know, the first prong, the deficient performance prong, it doesn't reach prejudice. That review is de novo. Which cases are those? Those would be Rompia v. Beard and Wiggins v. Smith. Those were decided in 2005 and 2003, respectively. Did Harrington overrule those on that point? It doesn't overrule them. It doesn't address those cases. And I believe that Harrington is a slightly different situation just because we have a reasoned State court decision here, and the reason is the Fifth Amendment violation with no addressing the prejudice prong. But in this case, there is a reasonable probability that but for trial counsel's failure to object to the admission of Mr. Machuco's post-invocation statements, the jury would not have concluded that he was guilty of first-degree premeditated murder. We have argued in our brief that the evidence in the record was insufficient to support a first-degree murder conviction, and assuming that Mr. Machuco's post-invocation statements and the statements of others during his interrogation were excluded, there is a reasonable probability that the jury would not have convicted him. The district court found that Mr. Machuco was not prejudiced by trial counsel's failure to object to the admission of his post-invocation statements, reasoning that none of his statements to police investigators were incriminating. This simply is not true. Post-invocation, Mr. Machuco stated that he had been with the victim the night he was killed and, in fact, may have been the last person seen with him. His statements unrelated to the crime were used as character evidence against him. The post-invocation videotape also included inculpatory and highly prejudicial statements about Mr. Machuco made by other witnesses, Investigator Casey's investigators Casey and Seconder and Osiel Garcia, who did not testify against him at trial. Investigator Casey repeatedly told Mr. Machuco on the videotape that she knew he was lying, that story did not match that of other witnesses, and that he better start changing his story. And at one point, she asked him whether the stains on his shoes were blood, which is particularly inflammatory because forensic testing later determined that there was no blood on his shoes and, in fact, no DNA. Most importantly, from the prosecution's perspective, after his invocation, Mr. Machuco changed his story about his whereabouts the night of the murder. The difference between his pre- and post-invocation statements enabled the prosecution to argue over and over again that Mr. Machuco was a liar and that he lied to police investigators and those lies were direct evidence of his guilt and his conviction. The Supreme Court in Strickland recognized that some errors have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. That is the case here. Measured against the State's weak circumstantial case, which was based largely on conflicting witness testimony, trial counsel's error was the thumb on the scales that resulted in Mr. Machuco's conviction. I have three specific points on prejudice. First, both comments. The first point is that both common sense and the law recognize the extreme impact that calling a criminal defendant a liar has on a jury. Here, because trial counsel failed to object, the prosecutor had the benefit of a videotaped interrogation that showed not just that Mr. Machuco's story differed from that of other  The prosecutor was only able to make the arguments that he did in closing because of the improper admission of Mr. Machuco's post-invocation statements. The courts, recognizing the extreme impact these kinds of arguments can have on a jury, require that there be an evidentiary basis for arguing that a witness or defendant is lying. Otherwise, such arguments can go beyond proper advocacy and are grounds for a claim of prosecutorial misconduct. Second, this argument was a central theme of the prosecution's case. The focus and weight that the State placed on Mr. Machuco's post-invocation statements demonstrate how incredibly important they were to his case. The prosecution's case. Ginsburg. What about the physical evidence that was in the case? I mean, because your argument predicated on the influence that having the videotaped confession, which shouldn't have been in there, had on the jury. But then there was physical evidence, wasn't there? Shoes found in the car he was driving when he was arrested with his and the victim's DNA on them? I believe that's the only piece of physical evidence that came into the record during the jury trial, was that there were shoes that were found in the trunk of the car that was confiscated from him. I believe it's five or six days after the murder occurred. And they had the victim's DNA on them, and they also had Mr. Machuco's DNA on them, but they also had DNA from another person. So I believe the testimony at trial was not 100 percent clear that those were Mr. Machuco's shoes. But that is the only piece of physical evidence in the record. In fact, this case is a lack of physical evidence of anything, given that there was no evidence that Mr. Machuco was ever at the crime scene. Is it physical evidence that he dyed his hair orange? I wouldn't consider that physical evidence of the crime. I would say that, if anything, it's circumstantial. And given that he dyed his hair five days after the crime, I don't believe that that's strong evidence that he was trying to change his appearance to hide. It's just a very simple question. Was that physical evidence? The answer is yes or no. No. Physical evidence of the crime, I would say no. I would like to address one point that you raised. The videotape does not show that Mr. Machuco actually confessed. It just showed that he changed his story. Okay. So that evidence is not in the record. Well, I'm with you that there was deficient performance. I'm struggling with the prejudice prong. Fair enough. I can – my third point is to talk about how incredibly weak the States case was. So, first of all, there were major gaps in the States case. One of them is the lack of physical evidence, and particularly the lack of evidence at the crime scene. In light that there is testimony and evidence that Mr. Machuco cut his hand so severely that it was down to the bone, there would be some blood or DNA evidence at the crime scene if that had happened there. And there's absolutely none. Also, there was no motive. Is it accurate that he did have serious cuts on his hand? Witnesses testified to that. Investigator Casey says on the – in the videotape, she looks at his hand. She testified that he had, you know, a serious cut there. And I believe that they introduced pictures of his hand and the cut taken at the time that he was interrogated that show a cut and some bruising. The State also offered no explanation of how Mr. Machuco got from the crime scene, assuming he was there, to either of the two locations that witnesses put him at a half an hour after the murder occurred. He could not have walked that distance in half an hour when it would have taken him 15 minutes to drive. Another question. Before he invoked the right to counsel, didn't he lie about an alibi in the tape? I don't know that he – certainly, I wouldn't say that he lied about anything. He did say that he was not with the victim the night of the murder. But he was with the victim the night of the murder. Well, witness testimony puts him with the victim the night of the murder. So, certainly, there is some evidence that contradicts all the other witness testimony. But, again, it wouldn't be the same level as evidence that he himself is changing his story and he himself is admitting that he initially lied. The State's case is also weak because it relied largely on contradictory and unreliable witness testimony. The State's witnesses contradicted each other on a number of material points. Where was Mr. Machuco the night the murder occurred? Did he go to Mr. Lucas's apartment, as Eric Rodriguez testified, or did he go to Mr. Wesley Porter's apartment, as Jennifer Lee testified? And who was he with? Was he with Jennifer Lee the night of the murder, as Wesley Porter testified, or was he alone? The witness does not provide a sufficient answer on these points. The State's witnesses that testified at trial were also highly impeachable. They were in police custody or in prison at the time of trial. They admitted to lying to police officers during the investigation. And they had motive to lie, to cover up their own involvement in the crime. And they were under the effects of drugs during the time frame they testified about, which impaired their testimonial capacity. There was also strong exculpatory evidence. The State's witnesses testified that Mr. Machuco and the victim, Mr. Camacho, were friends, and there was no animosity between them, even on the evening of the  Sotomayor, you're back to your old habits. I'm sorry? You're back to your old habits. Oh, am I going too fast again? Sorry. The next point is, again, none of his blood was found at the crime scene, despite the fact that he had a cut on his hand, and that was clearly the State's theory that he had cut his hand during the crime. And the evidence suggests that he had no plan to be alone with the victim the night that he was killed. Yolanda Pina testified that but for her insistence on being dropped home first from the casino, Mr. Machuco would not have found himself alone with the victim, and her testimony is undisputed on that point. Mr. Machuco's pre-invocation statements to police investigators also provided them with two other potential suspects, Eric Rodriguez and Hector, who had actual motives to kill the victim. Considered altogether, the gaps in the State's case, the unreliable and contradictory witness testimony, and the exculpatory evidence, the case against Mr. Machuco was extremely weak, making the prejudicial effect of trial counsel's errors all the more severe. I'm happy to address any further questions now, or I can reserve the rest of my time. Why don't you reserve your time? Okay.  Move that up. Good morning. May it please the Court. I'm Kevin Vienne. I'm a California Deputy Attorney General here for Respondent. The ‑‑ I'd like to make essentially two points. The first is that there was no prejudice and prejudice can't be found. My opponent says that the case was extremely weak. We disagree, or I disagree, and we as advocates disagree, but we're not the only ones who disagree. The California Court of Appeal, in addressing the question of the sufficiency of the evidence, at ‑‑ it's at excerpts of record page 60 in the Court of Appeal decision, described the case against Mr. Marquez Machuco as exceedingly strong. The district court agreed. Magistrate Judge Bristow, at excerpts of record page 28, described the case against Mr. Machuco as strong. Well, this rises or falls on what the evidence was, doesn't it? As does every criminal case, I believe. Pardon? I think that's a correct statement in general and certainly here. Yeah. And the evidence against Mr. Machuco was quite strong. That is, there was multiple people placed him with the victim just shortly before the crime almost certainly occurred. He, in the days preceding Mr. Camacho's death, Mr. Machuco was looking for a weapon, first a gun, then a knife, and he wound up with a knife that corresponded with the crime. There was some evidence of bad blood between the two of them. That is, two witnesses, one, Mr. Camacho, the victim's girlfriend, Jennifer Resendez, I think it's pronounced, said that he was behaving in the days before it happened, before the crime occurred, as if he was having trouble with someone. Jennifer Boyoung Lee, who was Mr. Machuco's girlfriend at the time, said that there was animosity between the two of them leading up to the night of the crime. Machuco is with the victim just before the crime occurs. After the crime occurs, he's got blood on him that's seen by three different people, Eric, Jen, and Wes. And where was this blood? The blood was on his, he was bleeding around his hand. Eric said the blood was on his clothing and he helped to clean him up. And Wes said that the blood, he could see the injury on his hand. Was there evidence that the blood came from any other source than his hand? No. I don't believe so, Your Honor. Okay. I think that's the only. Let me make that clear. Yes, thank you. The, and he lied about, there was a question about the prosecutor calling him a liar. Notwithstanding the interrogation and the post claim of invocation, there was plenty of evidence that he had lied, that he clearly had lied about whether he'd been with Camacho that night. Yolanda, Yolanda Pena had been picked up at the casino at 235. She's unimpeachable. Picked up at the casino by Camacho and Machuca at 235. Dropped off at her house at 245. The crime scene is 11 minutes away, is what the trial testimony was. Now, how did they estimate when the murder took place? He was wearing, the victim was wearing a watch, apparently a digital watch that had stopped at, I think, 319.25 or 315.19, but shortly after 3 o'clock. So about a half hour after Yolanda Pena said they had dropped her, dropped her at her apartment, and then there's another 11 minutes that are consumed as they travel to the crime scene. But there's evidence that he was a liar, notwithstanding his statements to the police. That is, he gave conflicting statements about how he had injured himself. He said that he had been in a fight at the casino with a couple of African Americans, but he told Jen that he'd hurt himself either dismembering a car or taking a car apart. Afterwards, he changed his appearance, and he was caught hiding under a blanket seven days later. He confessed to Jen on December 1st. He said he killed someone and that she could check the paper, and she checked the paper on the next day, December 2nd, confirming his confession to her. Is there some dispute as to whom he made this statement? I think there's no dispute about who he made the statement to. That is, the evidence is that he made it to his girlfriend, Jennifer Bo Young Lee. In the briefing by my opponent, they say that there's a question with the credibility because they say that she said he confessed to her on the morning of December 1st, but that couldn't have happened because she said she confirmed it by seeing the paper, and the paper wasn't out until December 2nd. But I believe it is, in the court of appeal opinion, in the excerpts of record, page 42, they said that she checked the paper on December 2nd, which is perfectly consistent with all that had happened. Finally, there simply is no explanation, no other reasonable explanation for him having the victim's blood anywhere on his person or on his clothing when the car was found. Were those shoes that were found in the car, were they his? Was there evidence that they belonged to him? Well, there were two pieces of evidence that suggested they belonged to him, and one was that his DNA was in the shoe. But that may have been equivocal because there were some other folks there. But there was other evidence tying the shoe to him, and that is that the shoes found in the car were K-Swiss, size 10. The shoes that he was wearing when he was arrested were K-Swiss, size 10. And I don't have a cite to that in the record of trial, but I saw that last night as I was rereading it. And that's referred to, I think, in the prosecutor's response to the motion for a new trial afterwards. So essentially what Machuca's counsel is arguing is you can't unring the bell of the closing argument and the videotape. Well, the problem is very little changes. I mean, we have Machuca agree that he had lied about not being with Ivan Camacho the night of the killing. That's the dramatic turn. But after that, he continues to deny. He says, I didn't kill him. I didn't hurt him. He was my friend. I wouldn't have done anything. That lie was apparent whether the police talked to him or not. That is, he said before any possible invocation that he was not with Ivan Camacho that night, that he was with his girlfriend. And that's it. Excerpts of record, page 528, before the questionable statement on page 546. So your point is you would have been able, had investigators stopped, you would have been able to still introduce the part before the invocation? Yes. He was a liar on a material point. He was evasive on a material point. And from that, the jury could infer a guilty mind. At some point, this is backing up. Where was Camacho's blood found? None was found on Machuca. That's correct. Other than the shoes. Other than the shoes. Well, there's a jacket also that's found in the trunk of the green Honda. And that jacket has Machuca's blood on it as well, a small amount. But that also is not – I mean, there's – the record isn't developed terribly clearly to – Machuca's blood, not Camacho's. No, it had Camacho's blood. You misspoke. I beg your pardon. Thank you for correcting me. But there's no evidence that I'm aware of that says he was wearing that jacket that night. He may have been, but there's no evidence of that in the record that I saw. Was the car owned by him? Not owned. It was a stolen car. He'd been driving it for several days. Jennifer Boyoung Lee said that she had gone over to Ossiel's, the location of Machuca's arrest, on that day, and he'd been driving it for a couple of days. There was a duffel bag in the trunk of the car that was – there was some question about the color of the duffel bag that belonged to him and the color that was taken. That is, one witness described it as dark green, another as gray, I think. But the evidence clearly connected him to the car and only him to the car at the time, and there was no other explanation for where the clothing in the car would have come from. Counsel, would you address the question of what our standard of review is under AEDPA? I think that question is up in the air, at least slightly at this point, Your Honor. I'd like to agree with you and say that after Harrington v. Richter, it's clear that the unexplained decision by the California Supreme Court is entitled to deference on any issue, if any argument can be made that it's entitled to deference. I think that's not quite clear, and the reason I say that is that, while Harrington v. Richter didn't address that directly, there is a brief mention of Yilts v. Nonemaker in Richter, is my recollection. I think you're right. And Yilts — It is a — people are disagreeing about how you interpret that. Yes. I mean, my point would be that it doesn't matter in this case, that this was an exceedingly strong case. Well, and also, I mean, and this is a particularly — it's interesting because we know the court of appeals didn't reach that. So the presumption from Richter that when the California Supreme Court denied review on the merits, it's logical to think they didn't need to reach that particular issue as well. I agree. Courts frequently decide on one prong or the other of Strickland. And, I mean, interestingly, a decision from this court that's in the United States Supreme Court now, Williams v. Cavazos, I think is the name of it, talks about what do you do where it appears that a state court has overlooked a constitutional claim. Do you know whether the question of prejudice was briefed to the California Supreme Court from the California — on appeal from the California Court of Appeal? I read the brief yesterday, but I can't recall much discussion of it. I mean, our position was simply that there was no unequivocal invocation of the right to silence. The court has been very patient with me. And I'd like to make just one other point quickly, and that has to do with whether counsel was ineffective, obviously ineffective in failing to make the Miranda claim, failing to seek to suppress. There are a couple of things in the trial record that are reflective of that. But I think perhaps the most interesting one is this. At the end of trial, after the conviction but before sentencing, Mr. Machuca retained another attorney to make a new trial motion for him. That other attorney did indeed make a new trial motion for Mr. Machuca. He raised two claims. One was the claim that there was insufficient evidence of premeditation. The other claim was that there was ineffective assistance of counsel by trial counsel in the course of the trial. Importantly, I believe, he didn't say that there was a problem in not challenging the admissibility of all of the statements.    challenging the admissibility of all of the statements. Roberts. Doesn't that give us a Martinez v. Ryan problem? Yeah, that's what I was going to say. Well, I think it is simply illustrative of the approach in the relevant legal community at the time, that is, another defense counsel who said he had read the record did not see this as a problem. I would. But whether the California Court of Appeal was correct on its judgment, whether it was right or wrong, and whether it was, and this is a different question, whether it was utterly unreasonable if it was wrong, on the merits of the Miranda question, what possible reason would there have been for counsel not to have made the Miranda argument? What strategic value could counsel have possibly offered for not making that argument? In the course of the hour of interrogation, his client stood firm. I did not hurt, I did not harm Ivan Camacho. Did counsel provide an affidavit here? Is he still alive? I don't know if he's alive. I tried to find him. I could find him, and I was unsuccessful. I did a Google search to see if I could find him. In some ways, I think it would be unfortunate to brand this person with ineffective assistance of counsel when no one has ever asked that question. Well, it's interesting because when I initially read this, I actually talked to my law clerk about a potential Martinez problem here, and I think the answer we came to was that because the State of California allows the person to make a claim of ineffective assistance of counsel in their State habeas proceedings, unlike Arizona, for example, that there would not be a problem because he could have raised it. Absolutely. This case does not deal with a procedural default because the State court in the direct appeal addressed the question on the merits, ineffective assistance. One final point, and again, thank you for the Court's patience, but one final point is this. Magistrate Judge Bristow relied largely in finding that there was an unreasonable application of Supreme Court precedent on two Ninth Circuit cases, one that had been decided just a few days before the Court of Appeal decision. That was Anderson v. Cherhoun. And he also relies on a case that was a couple of years older, Arnold v. Runnels. And in each of those cases, a majority found that there was an unequivocal invocation and granted relief. Interestingly and importantly, in each of those cases, what I believe are unquestionably fair-minded jurists on the Ninth Circuit said this was an equivocal invocation. That is, there was both a concurrence and a dissent in the answer to the question in the Anderson case. In Anderson, yes. Thank you, Your Honor, for helping me out there. And there was a dissent in Arnold. And in those cases, fair-minded jurists said that there could be a debate about whether there had been an unequivocal invocation of rights. And in Anderson in particular, it's important because Anderson is far closer to an unequivocal invocation. Mr. Anderson said, I plead the Fifth. That did not happen here. I mean, and Judge McKeon, I think in the lead opinion in Anderson, begins by explaining how everyone in this country knows what pleading the Fifth means. That's not what happened in this case at all. That is, Mr. Machuca was frustrated. But he did say, I don't want to talk about anything anymore. Yes. And I'm not saying that there aren't reasonable arguments on both sides. And maybe even the better argument is that that was an invocation. But I am saying that it was not unreasonable for the State court to say he was simply saying, I don't want to answer any more questions about who I think killed Mr. Camacho. And that's the decision the State court made. And if Richter is not relevant on the question of the standard, it certainly is relevant on how we should evaluate the State court decision. That is, is there a reasonable argument that can be made in support of the State court decision? I think if you look at the dissent in Arnold and if you look at the concurrence in dissent in Anderson, you'd have to say, yes, there is. A reasonable, fair-minded jurist in this country could disagree with the determination made by the district court and could agree with the determination made by the State court. Once again, thank you for your patience. Another ten seconds, perhaps. Counsel, you're right. I was going to say, your two minutes are up. Thank you very much, Your Honor. Thank you. Go ahead, counsel. Thank you. To very, very briefly address the Fifth Amendment issue, what the State court found was objectively unreasonable, and any other reading would have been objectively unreasonable, because the investigator asked a clarifying question. She asked what he didn't want to talk about, and he said, I don't want to talk about anything. There can be no ambiguity there. There can be really no debate on that point, I think. I want to turn very quickly to a couple specific things that counsel said, just because the record can be a little bit confusing. One thing, there was no jacket with the victim's blood found in Mr. Machuca's possession in the vehicle. The State appellate court decision, I believe, got it wrong, and we briefed this in our brief. The record shows very clearly that the jacket that was tested and the jacket that was found to have the blood on it was found on the victim at the murder scene. And that's very clear, and I can give you the site if I fumble through my papers, but it's definitely in our brief. So the only potential physical evidence is the blood on the shoe, which there's a question whether that shoe was actually Mr. Machuca's. The other thing I would like to quickly point out is that not only did, you know, Mr. Machuca's conflicting story come out and the fact that he, you know, himself contradicted his initial story pre-invocation, but also all the testimony, all the statements from Investigator Casey, you know, this police officer with a lot of authority saying, I know you're lying. I've got stories from other people. Your story doesn't match. I think you're the liar. I mean, this is taking it to another level. If they had just had the pre-invocation statements, it would have been I've got all these witnesses who most of them contradict each other on material points about the events of the evening. But your opposing counsel argues that a tactical reason for having done that, for not having made the Miranda suppression motion, would be that he denies everything. So in a way, so since he's denying everything, there's nothing incriminating on the tape. Well, one, the trial counsel did not argue from the tape whatsoever. He never once said, you know, my client, you know, persists in maintaining his innocence. He didn't argue from it at all. The idea that there was a strategic purpose that he actually thought about it and decided, yes, let's use these statements, I don't believe the record reflects that. And moreover, if he had meant to use those statements that he did think were helpful, he still would have objected to all the other evidence that was clearly detrimental, such as Investigator Casey's statements, such as the testimony from a witness who didn't testify at trial, or sorry, the statements from a witness, Osseo Garcia, who didn't testify at trial, and, you know, other impermissible character evidence that came in. And he didn't do any of that. He didn't object to any part of it. And it was played, you know, three, four times and in full for the jury. So the idea that there was some reasoned thought there, I think the evidence belies that. Counsel tried to suggest that there was significant evidence of Petitioner's opinion on that. The district court's opinion does ignore all of the incriminating evidence that came in. But more importantly, the standard for prejudice is not whether there was significant evidence of guilt. It's whether there was a reasonable probability that but for those errors that colored the entire evidence in the case, the outcome would have been different. And we're talking about, you know, a verdict of premeditated murder here. And, you know, the evidence does not support, certainly when you look at it and you have the argument from the evidence that Mr. Machuca was a liar and that those lies were direct evidence of his guilt, on this record, that can't be ignored. There's a couple of specific things that I would like to address. Counsel talked about that there was testimony that Mr. Machuca was with the victim the night of the murder. The evidence is not compelling in light of record on the record as a whole. Even if he was with the victim shortly before the murder, again, there's no physical evidence. The witness testimony on this point is contradictory about his whereabouts thereafter. And there's evidence that shows that he had no intention of being alone with the victim that night. The only witness who was not impeached, Yolanda Pina, is the one who testified that Mr. Camacho, the victim, was going to drop Mr. Machuca off first and she said, no, please take me home. My son is worried about me. So there's no intention here. When we're looking at a premeditated murder verdict, you know, there has to be some sort of planning. There has to be some sort of premeditation. And here the evidence goes against that. That would only suggest, that would only go to the, to the sufficiency of the evidence on the premeditation question, not as to whether he murdered him. But here the jury found that there was evidence of, or the jury found that. But you're not really arguing here insufficiency of the evidence. I'm just, the point I'm trying to make is that the conclusions that the jurors reached, that they had to find, they had to believe that there was some sort of evidence of premeditation. That obviously came from the idea that. Right. But there isn't anything about what the attorney did or didn't do with respect to Miranda that would call into question the premeditation. Right. My point is a different point, which is just that it's not specific to the premeditation, any evidence of premeditation. It's the general point that, you know, this really prejudicial, inflammatory both evidence and argument from the evidence on his lies, that they showed that he was guilty, that he was conscious of his guilt, all of that stuff. But all that could go to the question as to whether he committed the murder. And then a separate question would be, did he intend to murder this guy ahead of time? Right. Yes, that's correct. The other thing that the counsel mentioned was that witnesses testified that he showed up after the alleged murder occurred with blood on his clothing. They testified that there was blood as a result of the cut on his hand. There's absolutely no evidence in the record that that blood was Mr. Camacho's and certainly there was no forensic testing that was done that would prove that point. So again, no physical evidence. Cancel you, can you wrap it up because you're over your time? Oh, absolutely. I apologize. The point, the point being, I would urge the Court to look at the full evidentiary picture here and see the many ways and the many times that the prosecutor pointed to those post-invocation statements, use that as evidence of the lies and that that was direct evidence of his guilt and see that it really colored all the jury's determinations in this case. And for that reason, Mr. Machuca is entitled to habeas relief. All right. Thank you very much. Machuca v. McDonald is submitted. The next case is Stull v. Fox.
judges: Fletcher, Wardlaw, Bybee